CC-1998-408                                                                  1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. César J. Almodóvar Marchany, Secretario del Trabajo y Recursos Humanos de Puerto Rico, etc.<br>    Recurrido<br><br>        v.<br><br>G.P. Industries, Inc.<br>    Peticionario | Certiorari<br><br>2001 TSPR 4 |

Número del Caso: CC-98-408

Fecha: 17/enero/2001

Tribunal de Circuito de Apelaciones:

                        Circuito Regional VI

Juez Ponente:

                        Hon. Zaida Hernández Torres

Abogado de la Parte Peticionaria:

                        Lcdo. Carlos T. González Contreras

Abogada de la Parte Recurrida:

                        Lcda. Rosa M. Vázquez Bauzá

Materia: Reclamación de Salarios por Despido Injustificado

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| HON. CÉSAR J. ALMODÓVAR MARCHANY, Secretario del Trabajo y Recursos Humanos de Puerto Rico, en representación y para beneficio de JULIO DE LEÓN CUADRADO | | |
| Apelado Recurrido | | |
| v. | CC-98-408 | Certiorari |
| G.P. INDUSTRIES, INC. | | |
| Apelante-Recurrente | | |

Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.

En San Juan, Puerto Rico a 17 de enero de 2001.

Nos corresponde resolver si las causas desglosadas como justificadas para el despido de un empleado, contempladas en la Ley de Mesada de Puerto Rico, son taxativas. Si tal estatuto excluye otras causas no expresadas o especificadas en su texto, aunque la conducta o comportamiento del empleado pueda afectar el buen funcionamiento y operación de la empresa de su patrono. ¿Qué conducta o comportamiento del empleado tiene que estar incluido en un reglamento interno de la empresa, circulado a sus empleados, cuando está excluido del texto de la ley, para considerarse justa causa para el despido?  ¿Constituye una

relación adulterina de un ejecutivo de una empresa con otra persona, que a su vez trabaja para la misma y es supervisada por el primero, causa justificada para el despido por el hecho de afectar al cónyuge de uno de ellos, que también trabaja para la misma compañía, y de lesionar la paz y tranquilidad de la empresa en general? Estos son los asuntos que trae ante la consideración de este Tribunal el presente recurso. Expedido el auto de certiorari solicitado, y perfeccionado el mismo, se revocan las sentencias dictadas por el Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia y, en consecuencia, se declara sin lugar la querella presentada ante el foro de primera instancia por despido injustificado.

I

La querella de autos fue presentada en el Tribunal de Primera Instancia, Sala Superior de Humacao, el 11 de diciembre de 1996, por el Secretario del Trabajo y Recursos Humanos de Puerto Rico, en representación y para beneficio del señor Julio de León Cuadrado y en contra de la parte querellada G.P. Industries, Inc. Alegó la parte querellante ante el Tribunal de Primera Instancia, que el señor de León Cuadrado fue despedido sin justa causa por la parte querellada, patrono de éste último. Reclamó el pago de la suma de veintidós mil setenta y siete dólares con diez centavos ($22,077.10) por concepto de mesada.[1]

El 22 de enero de 1997, G.P. Industries, Inc. contestó la referida querella. Admitió la alegación de la parte querellante, relativa al período durante el cual el señor de León Cuadrado trabajó con esa empresa y el sueldo devengado. Arguyó como defensa, que el despido fue justificado. Argumentó que el señor de León Cuadrado exhibió conducta impermisible durante horas laborables, constitutiva de alterar la paz y tranquilidad de empleo en la empresa. Señaló que el señor de León Cuadrado se vio envuelto en una relación amorosa con otra empleada, quien estaba bajo su supervisión directa. Ambos eran casados, con el agravante de que el esposo de ella era un ejecutivo de alto rango y más años de servicio en la empresa, quien debido al escándalo surgido se vio seriamente afectado. Que tal conducta exponía a la empresa a serias consecuencias y/o riesgos de reclamaciones laborales bajo los esquemas legislativos antidiscriminatorios antes señalados, por motivo de la conducta impermisible exhibida. Arguyó, además, que ante la queja "presentada y respaldada y ante el conocimiento general de los demás empleados de la situación denunciada, la empresa se vió [sic] obligada a despedir a ambos empleados para así preservar la estabilidad y buen funcionamiento y decoro de la compañía".[2] (Énfasis nuestro.)

El juicio en su fondo fue celebrado el 15 de diciembre de 1997. El Tribunal de Primera Instancia formuló sus determinaciones de hechos, que están cobijadas bajo la presunción de corrección de los procedimientos, la cual no fue rebatida por no haberse presentado exposición narrativa alguna por la parte apelante ante el Tribunal de Circuito de Apelaciones.

El Tribunal de Primera Instancia dictó sentencia el 19 de enero de 1998, archivada en autos copia de su notificación el 6 de febrero de 1998, declarando con lugar la querella presentada. Condenó a la querellada a pagar al querellante la suma de veintidós mil setenta

---

[1] Apéndice III del recurso de Certiorari, págs. 47-48.
[2] Íd., pág. 52.

y siete dólares con diez centavos ($22,077.10) por concepto de mesada.[3]  Formuló en dicho dictamen el cuadro fáctico que procedemos a desglosar a continuación.

El querellante de autos, señor Julio de León Cuadrado, trabajó con la querellada, G.P. Industries, Inc. desde el mes de septiembre de 1971 hasta el 15 de enero de 1995, cuando fue despedido.  Al momento de su despido, el señor de León Cuadrado se desempeñaba como gerente de área en la región de Humacao-Fajardo, devengando un sueldo mensual de tres mil quinientos dólares ($3,500).

G.P. Industries, Inc. es una compañía que se dedica a la venta al detal de productos de equipo de seguridad, extintores, pintura de autos, equipo médico, soldaduras, entre otros.

La señora Lyzette Torres Rodríguez y su esposo, el señor Rafael Nieves Goitía, eran empleados de la empresa querellada.  El querellante fue empleado gerencial de la aludida compañía, así como el señor Nieves Goitía.  La señora Torres Rodríguez no era empleada gerencial.  El querellante era su supervisor o jefe inmediato.

Al momento de verter su testimonio ante el Tribunal de Primera Instancia, el señor Nieves Goitía contaba con cincuenta (50) años de edad y se desempeñaba como gerente de operaciones de la empresa. Antes había sido gerente de crédito corporativo y había comenzado a trabajar con la misma en el año 1970.  Posee un grado asociado en contabilidad y administración de empresas y computadoras de la Universidad de Puerto Rico, obtenido en el año 1970.

El señor Nieves Goitía conoció a la señora Torres Rodríguez en el año 1985, cuando ella comenzó a trabajar con la compañía querellada.  Para esa época el señor Nieves Goitía se encontraba casado con su primera esposa, con quien contrajo nupcias en el año 1970 y procreó tres (3) hijos.  Se divorció de ésta en el año 1990 para casarse con la señora Torres Rodríguez, al surgir un romance entre ellos cuando eran empleados de la empresa querellada.

El señor Nieves Goitía comenzó a notar que su esposa regresaba tarde al hogar de su trabajo, bajo los efectos de bebidas embriagantes. Tal conducta de su cónyuge lo intranquilizaba.  Se percató que en el recibidor de mensajes ("beeper") de su esposa había entre quince (15) a veinte (20) mensajes de amor.  Estos se produjeron entre los meses de septiembre a octubre de 1994. Él confrontó a su esposa, y ella aceptó los mismos. La señora Torres Rodríguez mantenía una relación amorosa con su supervisor o jefe inmediato, el querellante, señor de León Cuadrado.  Con motivo de tal situación, el señor Nieves Goitía comenzó a afectarse personalmente.  Recurrió a un sicólogo, quien le diagnóstico ansiedad y que estaba hiperactivo. **Sentía mucho coraje cuando veía al querellante en el lugar de trabajo.  Comenzó a observar un problema de absentismo en su trabajo.**

Por razón de que el señor Nieves Goitía mantenía una conducta que estaba afectando sus deberes y obligaciones en su empleo, fue convocado por el señor Alberto González Simonet, presidente de la empresa querellada.  El señor Nieves Goitía le explicó su problema.  Le expuso sobre la relación amorosa que estaba sosteniendo su esposa con el querellante. Este último le indicó que con rumores no se podía tomar acción contra el querellante.  Que necesitaba pruebas más confiables.

---

[3] Apéndice I, Íd., págs. 1-6.

El señor Nieves Goitía contrató los servicios del señor Carlos J. Dávila Sánchez, detective privado, quien comenzó una investigación el 10 de noviembre de 1994 y la finalizó el 14 de diciembre de ese mismo año. Dicha investigación corroboró la relación amorosa que sostenía el querellante con la señora Torres Rodríguez. El mencionado investigador produjo varias fotografías donde se observaba a la señora Torres Rodríguez y al querellante hablando, acariciándose y besándose en un establecimiento público. Rindió un informe dirigido al señor Nieves Goitía sobre los hallazgos de su investigación producto de su observación personal de la conducta de las personas concernidas. Tales documentos fueron ofrecidos y admitidos en evidencia, así como el testimonio del investigador sobre tales extremos.

Al momento de realizar la referida investigación, el señor Nieves Goitía se encontraba separado de su esposa. Para el año 1995 se reconcilió con ella y volvieron a convivir juntos, como resultado que el señor Nieves Goitía accediera a la petición de su esposa y le concediera una oportunidad para rehacer juntos sus vidas. Posteriormente, volvieron a separarse, disolviendo formalmente por divorcio, en el año 1997, el vínculo matrimonial que les unía.

**El señor González Simonet, presidente de la empresa querellada, testificó que decidió despedir de sus empleos tanto al querellante como a la señora Torres Rodríguez, porque había un estado de intranquilidad en la empresa que no era bueno para la misma. Expresó, que tomó tal decisión no obstante el querellante ser un excelente empleado y contra quien nunca se presentó querella, amonestación, ni ninguna acción en su contra mientras trabajó allí. Explicó, que intentó agotar al máximo las alternativas para no tomar la drástica decisión del despido, por lo buen empleado que era. Pensó e intentó reubicarlo en otro lugar dentro de la compañía, pero no dio resultado, porque en algún momento tanto el señor Nieves Goitía como el querellante se encontrarían. No hubo otra alternativa que despedir al querellado de autos para no afectar más al esposo humillado, señor Nieves Goitía, en el plano personal, así como en su trabajo, y para restablecer la tranquilidad en el ambiente de trabajo. Expresó, además, que para llegar a esa extrema decisión se tomó en consideración el hecho de que el señor Nieves Goitía era un alto ejecutivo que llevaba más años laborando en la empresa que el querellante, y que ambos eran empleados gerenciales de la misma. Necesariamente ambos tenían que interrelacionarse en el sitio de trabajo.**

Al momento del despido no existía, ni nunca existió, en la compañía querellada un manual de personal que describiera y/o tipificara como prohibida la situación que dio margen para dicho despido. Tampoco existía ninguna política de la empresa relacionada a la situación surgida dentro del cuadro fáctico del caso discutido. No existía disposición al respecto en un manual de empleados que describiera tipos de faltas sobre el asunto y las sanciones a imponerse.

El Tribunal de Primera Instancia concluyó que "[a]ún cuando pueda concluirse que la acción que sostuvo el querellante con su subordinada Lyzette Torres Rodríguez fue una inmoral habida cuenta que tanto él como ella eran casados, en ausencia que dicha situación se encuentre entre las enumeradas en el referido Artículo 2, y en ausencia también que se encuentre previamente definida dentro de un Manual de Empleados y/o sobre conducta ilegal y/o faltas y/o prohibiciones contra la empresa querellada, por cuanto dentro de la compañía querellada no existía tal manual como usualmente existen y/o deban existir; no considera

y no concluye por consiguiente esta Corte que ello sea entonces razón para su despido". Concluyó, además, que "aún cuando la referida situación amorosa pudiera estar afectando naturalmente al esposo de dicha empleada personalmente y en su trabajo, <u>como se desprendió de la prueba de la querellada al tenérsele que llamar la atención por su baja producción</u> (testimonio de Violeta Canino); tampoco ello a juicio de esta Corte convirtió la situación surgida en una de despido por justa causa porque tampoco está comprendida dentro del referido Artículo 2".

No conforme con lo dictaminado por el Tribunal de Primera Instancia en el caso de autos, la parte querellada apeló ante el Tribunal de Circuito de Apelaciones el 9 de marzo de 1998. Arguyó ante ese Tribunal, que el Tribunal de Primera Instancia partió de una premisa equivocada, consistente en que bajo el esquema legislativo del Artículo 2 de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada,[4] es necesario e indispensable que la causa para el despido esté taxativamente incluida en el listado que dispone dicho estatuto para considerarse como justificado el mismo.[5]

El Tribunal de Circuito de Apelaciones emitió sentencia el 30 de marzo de 1998, archivada en autos copia de su notificación el 12 de abril de 1998. Concluyó dicho foro apelativo, que el comportamiento del empleado despedido no está contemplado en el Art. 2 de la Ley Núm. 80, <u>supra</u>, ni contenido en ningún reglamento circulado a los empleados que clasificara o tipificara como prohibida la actuación incurrida por el empleado y que dio lugar al despido. Concluyó, además, que el comportamiento del señor de León Cuadrado no afectó su desempeño profesional ni produjo que incumpliera con las responsabilidades de su empleo. Determinó dicho Tribunal, que el comportamiento del señor de León Cuadrado estaba dentro de la esfera privada de él y de los demás protagonistas de la situación que presenta el caso de autos, por lo que su patrono lo despidió injustificadamente.

No conforme con lo dictaminado por el Tribunal de Circuito de Apelaciones, la parte recurrente, G.P. Industries, Inc., acude oportunamente ante nos, señalando como errores cometidos por ese Tribunal los siguientes:

> Erró el Honorable Tribunal de Circuito de Apelaciones en su interpretación, análisis y aplicación de la Ley Núm. 80 del 30 de Mayo [sic] de 1976, <u>supra</u>, al concluir en su sentencia que las circunstancias y los hechos específicos que motivaron el despido del querellante-recurrido en el presente caso no constituyen "justa causa" al amparo de la referida Ley Núm. 80 [sic] y de su jurisprudencia interpretativa.
>
> [a]. Erró el Tribunal de Apelaciones al intimar que la Ley Núm. 80, supra, no tipifica ni considera la actuación como justa causa para el despido, por no estar específicamente comprendida dicha conducta en la citada Ley [sic] como circunstancias justificativas para un despido.
>
> [b]. Erró el Tribunal de Apelaciones al concluir que "para que un patrono pueda alegar que su empleado incurrió en un comportamiento que representa justa causa para su despido, tiene que hacerlo amparado en un reglamento cuya versión escrita haya sido distribuida a dicho empleado".
>
> [c]. Erró el Tribunal de Apelaciones al concluir que el patrono recurrente estaba impedido de utilizar como razón justificado (sic) para el despido del querellante-recurrido el comportamiento o conducta de éste último por no estar el mismo vedado o proscrito por un reglamento que clasificara el comportamiento exhibido como justa causa para el despido.
>
> [d]. Erró el Tribunal de Apelaciones al concluir que "[S]e trataba de una actuación que queda comprendida dentro de la esfera privada de sus protagonistas", por lo que el patrono incurrió en un despido injustificado.

---

[4] 29 L.P.R.A. sec. 185(b).

[5] Apéndice III, Íd., págs. 23-24.

Expedido el auto solicitado, y perfeccionado el mismo, procedemos a su evaluación y consideración en los méritos.

II

Para contestar las interrogantes que presenta el recurso ante nos, es preciso auscultar, averiguar y determinar cuál fue la intención legislativa al aprobar el Art. 2 de la Ley Núm. 80, supra. Nuestro ministerio consiste en descubrir y hacer cumplir la verdadera intención y deseo de la Asamblea Legislativa al aprobar dicho estatuto. Para ello, es de gran ayuda lo discutido en el seno de la comisión que la estudió y las discusiones en el hemiciclo. Los informes de comisiones y los debates en el hemiciclo, en adición al texto de la ley, son las fuentes de mayor importancia en la tarea de determinar el significado de un acto legislativo.[6]

La función de los tribunales es interpretar la ley, sin juzgar su bondad o sabiduría.[7] Es obligación de los tribunales armonizar, hasta donde sea posible, todas las disposiciones de ley envueltas en el caso, con miras a lograr un resultado sensato, lógico y razonable que represente la intención del legislador.[8]

Toda acción legislativa persigue su propósito. Trata de corregir un mal, alterar una situación existente, complementar una reglamentación vigente, fomentar algún bien específico o el bienestar general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno.[9] Siempre tiene que haber una razón para que exista una ley, y situaciones que no estén dentro de la razón de un precepto no deben ser consideradas como incluidas en él, aunque así aparezca de la letra de la ley.[10]

El más destacado y fundamental resorte de la interpretación racional es el elemento teleológico derivado del fin de la ley. La ley siempre es el medio para obtener un fin y, por consiguiente, ha de ser interpretada atribuyéndole el sentido que mejor responda a la realización del resultado que a través de ella se quiere obtener. El análisis de los motivos y finalidad de la norma jurídica supone una delicada y compleja apreciación de intereses prácticos y de ideales éticos y culturales. Exige abundar en las realidades de la vida, en sus exigencias económicas y sociales. Es nuestro deber poner en vigor con lealtad escrupulosa las normas contenidas en las leyes, cumpliendo a cabalidad los fines que en

---

[6] Pueblo v. Figueroa, 77 D.P.R. 188, 196 (1954) (Snyder); Pueblo v. Miranda, 79 D.P.R. 710, 713-714 (1956) (Saldaña); López v. Muñoz, Gobernador, 81 D.P.R. 337, 350 (1959) (Santana); Petrovich v. Srio. de Hacienda, 79 D.P.R. 250, 260-261 (1956) (Saldaña); Downs v. Porrata, Fiscal, 76 D.P.R. 611, 614 (1954) (Belaval); Pueblo v. Tribunal Superior, 75 D.P.R. 535, 548 (1953) (Marrero); Cooperativa Cafeteros v. La Capital, 82 D.P.R. 51, 58 (1961) (Blanco); Dávila Vives v. Tribunal Superior, 93 D.P.R. 776, 779 (1966) (Blanco); Municipio de San Lorenzo v. Tribl. Superior, 86 D.P.R. 205, 209 (1962) (Dávila); Fratallone Di Gangi v. Tribunal Superior, 94 D.P.R. 104, 111 (1967) (Blanco); Amer. Babtist Home Mis. Soc. v. Registrador, 94 D.P.R. 43, 47-48 (1967) (Ramírez); Srio. del Trabajo v. Asoc. de Señoras Damas, 94 D.P.R. 137, 146 (1967) (Ramírez); Pueblo v. Tribunal Superior, 86 D.P.R. 834, 846-847 (1962) (Opinión concurrente del Juez Santana); Robledo, Alcalde v. C.V.Q.M., 95 D.P.R. 1, 7-8 (1967) (Blanco); Srio. de Justicia v. Tribunal Superior, 95 D.P.R. 158, 161-163 (1967) (Pérez); García Gómez v. Comisión Industrial, 87 D.P.R. 554, 556 (1963) (Per Curiam), inter alia.

[7] Famania v. Corp. Azucarera de P.R., 113 D.P.R. 654 (1982).

[8] Andino v. Fajardo Sugar Co., 82 D.P.R. 85, 94 (1961); García Comercial v. Srio. de Hacienda, 80 D.P.R. 765, 774-775 (1958).

[9] Mills Factors Corp. v. Registrador, 97 D.P.R. 379, 383 (1969).

[10] Morales Torres v. Tribunal Superior, 99 D.P.R. 459 (1970).

forma clara e inteligible trazan los preceptos de la ley.  Sobre este tema, expresó este Tribunal en Figueroa v. Díaz,[11] que "[l]o que está en el espíritu de un estatuto está en el estatuto, aunque no está en su letra; y lo que está en su letra no está en el estatuto, a menos que esté en su intención".

Al abordar un problema de interpretación, los jueces debemos ser cautelosos de no leer nuestra particular preferencia personal en el estatuto.  De no dar énfasis exclusivo o improcedente a un criterio, sino que debemos situarnos en el cuadro total de las circunstancias que nos permitan determinar la intención legislativa.[12]  En el proceso de encontrar el significado de una ley que logre los propósitos del legislador, la interpretación judicial debe hacerse con fines socialmente útiles.

Los tribunales, generalmente, podemos rechazar una interpretación exactamente literal que conduzca a consecuencias irrazonables.  La literalidad puede ser ignorada por los tribunales sólo cuando ella es claramente contraria a la verdadera intención o propósito legislativo, según tal propósito o intención puede surgir de la totalidad del estatuto o de la sección envuelta.[13]

Corresponde a los tribunales resolver las contradicciones en el propio estatuto, a base de la intención auténtica del legislador.  Ese propósito no debe ser el del juez, sino el del legislador, según surja del estatuto en sí.  El juez es un interprete y no un creador.[14] La función de la interpretación judicial para negar eficacia a un precepto se extiende hasta el punto de sustituir o eliminar judicialmente alguna disposición estatutaria que derrote el propósito de la ley.[15]  Todo conflicto entre disposiciones de un mismo estatuto debe resolverse a favor del propósito legislativo en su integridad, en armonía con el más eficaz cumplimiento y pleno efecto del mismo.  La obligación judicial fundamental en estos casos es la de imprimirle efectividad a la intención legislativa, aún hasta el punto de sustituir o eliminar alguna frase específica estatutaria que, con diáfana claridad, haya sido incorporada a un estatuto por inadvertencia o error, que tenga el efecto de que esa frase derrote obviamente la intención legislativa que surge de la totalidad de la ley.[16]

### III

El Art. 2 de la Ley Núm. 80, supra, dispone lo siguiente:

Se entenderá por justa causa para el despido de un empleado de un establecimiento:

(a)    Que el obrero siga un patrón de conducta impropia o desordenada. (Énfasis nuestro.)

(b)    La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.

---

[11] 75 D.P.R. 163, 175-176 (1953).

[12] Marrero Cabrera v. Caribbean Refining Co., 93 D.P.R. 250, 269 (1966).

[13] Clínica Juliá v. Sec. de Hacienda, 76 D.P.R. 509, 520-522 (1954).

[14] Comunidad Fajardo v. Tribl. de Contribuciones, 73 D.P.R. 543 (1952).

[15] Rocafort v. Álvarez, 112 D.P.R. 563, 571 (1982); Rivera Cabrera v. Registrador, 113 D.P.R. 661, 665 (1982).

[16] Cancora Marina, Inc. v. Srio. de Hacienda, 114 D.P.R. 248, 258 (1983).

(c) <u>Violación reiterada por el empleado de las reglas y reglamentos razonables</u> establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado. (Énfasis nuestro.)

(d) Cierre total, temporero o parcial de las operaciones del establecimiento.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.

No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.

La intención legislativa detrás de la Ley Núm. 80 de 30 de mayo de 1976,[17] tuvo el propósito de eliminar el requisito previo de la Ley de Mesada anterior, a los efectos de que el empleado despedido tuviera necesariamente que trabajar para una operación de negocios lucrativa.[18] Tal estatuto definió, por primera vez, el concepto de justa causa para el despido de un empleado. Se puntualizó por la Legislatura que no se consideraría despido por justa causa aquél que se hace sin razón relacionada con el buen y normal funcionamiento de la empresa.[19]

El Art. 2 de la Ley Núm. 80, <u>supra</u>, amplió la base conceptual de la justa causa para el despido. El informe conjunto de las Comisiones de Trabajo y de Derechos Civiles del Senado, que procedió a la aprobación de la Ley Núm. 80, <u>supra</u>, expresa que " [e]l propósito [de la medida] es darle mayor protección a los trabajadores en situaciones de despido a que se vean expuestos", y hacer más restrictivo el concepto de justa causa. Séptima Asamblea Legislativa, Senado, 23 de abril de 1975.[20]

¿Son las causas desglosadas como justificadas para el despido de un empleado contempladas en el Art. 2 de la Ley Núm. 80, <u>supra</u>, taxativas? ¿Excluye tal estatuto otras causas no expresadas o especificadas en su texto, aunque la conducta o comportamiento del empleado pueda afectar el buen funcionamiento y operación de la empresa de su patrono? La contestación a la primera interrogante es en la afirmativa; la segunda en la negativa. Veamos.

Según su exposición de motivos, la Ley Núm. 80, <u>supra</u>, constituyó un esfuerzo del Poder Legislativo tendente a proteger "de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante... unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado...". Su texto es

---

[17] 29 L.P.R.A. sec. 185 <u>et seq.</u>

[18] Ley Núm. 50 de 20 de abril de 1949.

[19] Véase informe rendido en marzo de 1975 a la Cámara de Representantes de la Séptima Asamblea Legislativa, Tercera Sesión Ordinaria por la Comisión de Comercio e Industria, honorable Rafael Negrón, Presidente.

uno amplio y abarcador en muchos extremos y en otros más preciso. Su lectura refleja que el concepto de "justa causa" es uno dinámico, que se nutre de múltiples y fluidas situaciones imposibles de prever.

El Art. 2 de la Ley Núm. 80, supra, no pretende, ni puede, considerada la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una y en cada instancia.[21]

Para propósitos de aplicar las diferentes leyes protectoras del trabajador hemos utilizado, a manera de referencia, sin ánimo de ser exhaustivos y en forma orientadora, las enumeradas en el Art. 2 de la Ley Núm. 80, supra, como causas justificadas para el despido.[22] Dicho estatuto se limita a dar algunos ejemplos, no exhaustivos, de lo que se considera justa causa para el despido.

La Ley Núm. 80, supra, revierte singular importancia en todos los casos que envuelven una reclamación por despido, debido a que toda determinación de justa causa para el mismo deberá hacerse de conformidad con las disposiciones de dicha ley y la jurisprudencia que la interpreta. Por lo tanto, aún cuando se trate de una reclamación instada al amparo de otra ley que dispone remedios en caso de un despido en violación a la misma, si se alega justa causa para el mismo debe recurrirse a la Ley Núm. 80, supra, para la adjudicación de la controversia. Esto obedece a que la misma establece, aunque de forma general, lo que constituye justa causa para el despido.[23]

Concluimos, que el principio rector que gobierna el despido por justa causa contemplado en el Art. 2 de la Ley Núm. 80, supra, es aquél que delimita las circunstancias en que se produce el mismo. **Es decir, cuando tiene su origen en alguna razón y motivo vinculado a la ordenada marcha y normal funcionamiento de una empresa y no en el libre arbitrio o capricho del patrono.** La lista de ejemplos que contiene el referido estatuto persigue ilustrarnos y orientarnos en una forma no exhaustiva sobre el tipo de conducta que constituye razón y motivo justificado para el despido, por estar reñido con la ordenada marcha y normal funcionamiento de una empresa. Sin embargo, tal desglose no excluye otra conducta del empleado que, por estar vinculada al buen funcionamiento de la empresa, podría constituir justa causa para el despido. Tal lista no es taxativa.

El Art. 2 de la Ley Núm. 80, supra, no favorece el despido como sanción a la primera falta, y así se deduce del uso por el legislador de las voces "patrón" y "reiterada" al concretar la justa causa para el despido en que el obrero incurra en un patrón de conducta impropia o desordenada, o en violación reiterada de las reglas y normas de la empresa para la cual trabaja. Sin embargo, el referido estatuto no excluye el despido por motivo de una primera o única ofensa,

---

[20] Srio. del Trabajo v. I.T.T. 108 D.P.R. 538 (1979), pág. 541.
[21] Íd, pág. 542.

[22] Belk v. Martínez, res. el 30 de junio de 1998, 98 TSPR 109, 146 D.P.R. ___ (1998), 98 J.T.S. 92; Soto v. Hotel Caribe Hilton, 137 D.P.R. 294 (1994); Rivera Águila v. K-mart de P.R., 123 D.P.R. 599, 610 (1989); Báez García v. Cooper Labs., Inc., 120 D.P.R. 145, 151-152 (1987).

[23] Guía revisada para la interpretación y aplicación de la Ley Núm. 80, Departamento del Trabajo y Recursos Humanos de Puerto Rico.

cuya intensidad de agravio así lo requiera, en protección de la buena marcha de la empresa y la seguridad de las personas que allí laboran. **Se considera una sola ofensa o primera falta como justa causa para el despido, si por su gravedad y potencial de daño pone en riesgo el orden, la seguridad, la eficiencia y el ambiente de trabajo, afectando de esa forma la buena marcha y funcionamiento normal de la empresa.**[24] Tal ofensa tiene que ser de tal seriedad o naturaleza que revele una actitud o una característica lesiva a la paz y al buen orden de la empresa, que constituiría una imprudencia esperar su reiteración para despedirlo.[25]

IV

¿Qué conducta o comportamiento del empleado tiene que estar incluido en un reglamento interno de la empresa circulado a sus empleados, cuando está excluido de la lista de situaciones que contempla el Art. 2 de la Ley Núm. 80, supra, para considerarse justa causa para el despido?

El patrono puede adoptar las reglas y reglamentos razonables que estime necesarios para el buen funcionamiento de la empresa, siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.[26]

Las reglas y reglamentos que establecen las normas de trabajo de una empresa, y los beneficios y privilegios que disfrutará el empleado, forman parte del contrato de trabajo. Como regla general, un patrón de incumplimiento de estas normas podrá dar lugar a un despido justificado. Sin embargo, la ausencia de razonabilidad de esas normas podría convertir el despido en uno caprichoso o arbitrario y, por lo tanto, injustificado. Los beneficios y privilegios contenidos en esas reglas o reglamentos constituyen derechos del empleado, y un despido en violación a estos también resultaría en un despido injustificado.[27] No obstante, el patrono tiene perfecto derecho a evaluar a su personal, a base de las normas de la empresa, y ello debe tomarse en consideración a los fines de determinar justa causa para el despido.[28] Además, tiene derecho a evaluar a su personal, a base de los valores morales y de orden público prevalecientes en Puerto Rico, de conocimiento general en nuestra sociedad, **cuando el cumplimiento o violación de los mismos puede mantener o alterar el buen y normal funcionamiento de la empresa.** Tales evaluaciones tienen que ser razonables.[29] Dichos ejercicios evaluativos son congruentes y armonizables con recomendaciones sobre mejoramiento en las condiciones de empleo, de ascensos y promociones, cuando evidencian la capacidad o competencia del empleado. De la misma forma, su resultado puede indicar la necesidad de dirigir apercibimientos al empleado por razón de deficiencias en su trabajo, de tomar medidas disciplinarias, u otras. Esas evaluaciones forman parte del historial

---

[24] <u>Srio. del Trabajo v. I.T.T.</u>, <u>supra</u>, págs. 542,543.

[25] Íd., pág. 544; <u>Delgado Zayas v. Hosp. Int. Med. Avanzada</u>, 137 D.P.R. 643, 650 (1994).

[26] <u>Srio. del Trabajo v. I.T.T.</u>, <u>supra</u>, págs. 542, 543.

[27] <u>Santiago v. Kodak Caribbean, Ltd.</u> 129 D.P.R. 763, 775-776 (1992); <u>Rivera Águila v. K-mart de P.R.</u>, <u>supra</u>., págs. 613-614.

[28] <u>Báez García v. Cooper Labs., Inc.</u>, <u>supra</u>, págs. 153-154.

[29] Se amplía el contorno de esta norma, por entender este Tribunal que valores de este tipo, de conocimiento general, no es necesario que sean incluidos en las reglas o reglamentos internos de la empresa.

individual de cada empleado dentro de la empresa para la cual trabaja. Su licitud y utilidad para múltiples fines, de naturaleza administrativa, operacional y de mejoramiento de la eficiencia y desarrollo de la empresa y de sus empleados, es incuestionable.[30] Sin embargo, como explicáramos previamente, es justificado el despido en primera o única ofensa, aunque no esté contemplada la misma en las reglas y reglamentos de la empresa, por aquella falta cuya intensidad de agravio así lo requiera, para proteger el normal y buen funcionamiento de la empresa. No obstante, la falta única se sanciona con el despido sólo por excepción, atendidas las circunstancias particulares de cada caso.[31]

V

¿Constituye una relación de naturaleza adulterina de un ejecutivo de una empresa con otra persona, que a su vez trabaja para la misma y es supervisada por el primero, causa justificada para el despido por afectar al cónyuge de uno de ellos, que también trabaja para la misma compañía, y de lesionar la paz y tranquilidad de la empresa en general? La contestación es en la afirmativa. Veamos.

En el ejercicio de sus derechos y en el disfrute de sus libertades, toda persona estará solamente sujeta a las limitaciones establecidas por la ley, con el único fin de asegurar el reconocimiento y el respeto de los derechos y libertades de los demás, y de satisfacer las justas exigencias de la moral, del orden público y del bienestar general en una sociedad democrática.[32] (Énfasis nuestro.)

Hemos señalado, que "[e]n nuestra sociedad y en las sociedades del pasado, ha existido siempre un interés público en la conservación del matrimonio, piedra angular de la familia. Nuestro Código Civil confiere al contrato matrimonial categoría de institución social".[33]

El matrimonio es después de todo la "institución fundamental y eje central de nuestra sociedad [que] continúa siendo la base de la familia y de la vida social".[34] Por otra parte, el Art. 88 del Código Civil de Puerto Rico[35] consigna los deberes mínimos con los que las parejas se comprometen a cumplir libremente dentro de un matrimonio: "[l]os cónyuges están obligados a vivir juntos, guardarse fidelidad y socorrerse mutuamente". Debido a que el adulterio representa la más grave violación a dicho deber de fidelidad, el inciso (1) del

---

[30] Íd., pág. 154.

[31] Delgado Zayas v. Hosp. Int. Med. Avanzada, supra, págs. 649-650; Srio. del Trabajo v. I.T.T., supra, págs. 542-543.

[32] Declaración Universal de los Derechos Humanos aprobada por la Asamblea General de las Naciones Unidas, Artículo 29, inciso 2 (París, 10 de diciembre de 1948), citada en Hermina González v. Srio. del Trabajo, 107 D.P.R., 667,675 (1928).

[33] Véase Opinión de conformidad emitida por el Juez Asociado señor Corrada del Río, a la cual se unió el Juez Presidente señor Andréu García en el caso Cruz v. Empresas Massó, res. el 24 de junio de 1998, 98 TSPR 80, 145 D.P.R. ____ (1998), 98 J.T.S. 82, pág. 1224, la cual nos persuade en los extremos aquí citados y en cuanto a su aplicación a las circunstancias particulares de este caso.

[34] Íd., pág. 1224; doctora R.E. Ortega-Vélez, Lecciones de Derecho de Familia, (1997), pág. 183.

[35] 31 L.P.R.A. sec. 281.

Art. 96 del Código Civil de Puerto Rico[36] lo contempla como la primera de las causales de divorcio.[37]

No obstante, debido a la naturaleza furtiva de las relaciones adulterinas, la prueba presentada por la parte que solicita el divorcio por la causal de adulterio, aunque puede resultar ser insuficiente para probar los elementos de la misma, en muchos casos, "[r]esulta tan persuasiva y convincente que los tribunales llegan a la conclusión de que la [conducta de su cónyuge] constituye trato cruel e inhumano y a base de esa conducta decretan el divorcio".[38]

En nuestra jurisdicción el adulterio es también conducta delictiva. El Art. 129 del Código Penal lo tipifica como tal.[39]

El adulterio en nuestra sociedad atenta contra los principios de sana convivencia social, respeto al prójimo, a su dignidad y a su autoestima. El lugar de trabajo, sea este público o privado, no puede estar exento de la aplicación de estos principios básicos de convivencia humana prevalecientes en Puerto Rico, cuando afecta el buen y normal funcionamiento de la empresa para la cual se trabaja.

La relación de naturaleza adulterina de una mujer y un hombre casado con otra persona, es considerada en nuestra sociedad como una vejación y un atropello a la dignidad del otro cónyuge, como ser humano y como esposo o esposa. Representa una seria agresión a la institución social de la familia que emana del matrimonio.

El señor Nieves Goitía presentaba un cuadro de intranquilidad por la conducta exhibida por su esposa, ya mencionada. Advino a conocimiento de que sostenía relación amorosa con uno de sus compañeros gerenciales de la empresa. Con motivo de la vejación y atropello a su dignidad como ser humano de que estaba siendo objeto, comenzó a afectarse personalmente y a reflejarse tal situación en su desempeño en el trabajo. Presentó un problema de absentismo. Sentía mucho coraje cuando veía al señor de León Cuadrado en el lugar de trabajo. Por razón de que estaba faltando a los deberes y obligaciones de su empleo, fue convocado por el presidente de la empresa a una reunión. Como resultado de la misma, le produjo a éste último la evidencia sobre la existencia de la relación de naturaleza adulterina entre su esposa y el señor de León Cuadrado. **Tal situación creó un estado de intranquilidad en la empresa y afectó el ambiente de trabajo. Existía aprehensión en el ánimo del señor González Simonet, presidente de la compañía, de que necesariamente los dos hombres habrían de tener que interrelacionarse por razón del trabajo.**

**La conducta exhibida por la señora Torres Rodríguez y el señor de León Cuadrado, infringió valores morales y de orden público fundamentales para nuestra sociedad. Al ser los tres protagonistas de este drama humano empleados de la misma empresa, necesariamente lo ocurrido tenía que producir el estado de intranquilidad y desasosiego ya mencionado en la empresa y en las personas que allí trabajaban. Los hechos de este caso reflejan que**

---

[36] 31 L.P.R.A. sec. 348 (1).

[37] Véase Opinión de conformidad emitida por el Juez Asociado señor Corrada del Río, supra, pág. 1224, que a su vez cita R. Serrano Geyls, Derecho de Familia de Puerto Rico y Legislación Comparada, Vol. 1, pág. 533 (1997), pág. 1225.

[38] Olivieri v. Escartín, 79 D.P.R. 535, 538 (1956).

[39] 33 L.P.R.A. sec. 4147.

**tal conducta de los agresores fue una continua, por un espacio de tiempo indefinido, que produjo el efecto antes indicado sobre su normal y buen funcionamiento.**

La conducta constitutiva de un empleado casado, de infringir valores morales y de orden público fundamentales, al envolverse en una relación adulterina con otra persona, no es una que tenga que estar incluida en las reglas y reglamentos de una empresa, circulados a los empleados, para constituir justa causa para el despido, **cuando afecta el buen y normal funcionamiento de la empresa.** Los valores morales y de orden público fundamentales, como los presentes en el caso ante nos, son parte integral de nuestra sociedad, pues el matrimonio es su eje central, por ser la base de la familia y de la vida social.

**La violación de los valores antes enunciados no constituye per se justa causa para el despido, a menos que afecte el buen y normal funcionamiento de la empresa. De otra forma, nos apartaríamos del espíritu del Art. 2 de la Ley Núm. 80, <u>supra</u>.** El elemento teleológico derivado del fin de la ley fue darle mayor protección a los trabajadores en la tenencia de su empleo y en situaciones de despido a las que se ven expuestos. La intención del legislador fue limitar la justa causa para el despido a aquella vinculada a la ordenada marcha y normal funcionamiento de una empresa y que no descansara en el libre arbitrio o capricho del patrono. Entendemos, que la interpretación que aquí realizamos a dicho estatuto le atribuye el sentido que mejor responde a la realización del resultado que el legislador quiso obtener y los fines socialmente útiles que persiguió con su aprobación.

Hemos señalado que "[u]na sociedad civilizada no puede legitimar ni elevar a rango de virtud la mentira".[40] "La buena fe insufla su espíritu en la celebración, ejecución y extinción de la relación laboral; también en el período precontractual en cuanto al deber de los contratantes de actuar lealmente al darse recíproca información".[41]

Como cuestión de principio ético-jurídico, hemos resuelto que mentir en una solicitud de empleo constituye una falta grave que, en unión a otras circunstancias, puede ser causa válida para el despido.[42] Mentir tiende a destruir la dinámica expuesta y tiene el efecto de penalizar a aquel otro trabajador honesto que, al suministrar verazmente la información, no obtuvo el empleo. Semejante axioma premia y remunera la mentira.[43]

**Concluimos, que atendidas las circunstancias particulares de este caso, la conducta observada por el señor de León Cuadrado y la señora Torres Rodríguez produjo un estado de intranquilidad en el ambiente de trabajo, lo cual, a su vez, puso en riesgo el orden y normal funcionamiento de la empresa.**

La ley admite la extrema sanción de despido, aún en casos de falta única para la ofensa aislada de todo concepto de reiteración o curso de conducta, si dentro de las circunstancias en que se impone dicho castigo de separación del empleo no refleja arbitrariedad o capricho

---

[40] <u>Aut. Edif. Púb. v. Unión Indep. Emp. A.E.P.</u>, 130 D.P.R. 983, 985 (1992).

[41] Íd., pág. 985, cita de C.A. Tamantini, <u>El principio general de la buena fe y la ley de contrato de trabajo</u>, 1989, E. Rev. Jur. Arg. La Ley 919, 923-924 (1989).

[42] Íd., pág. 986. En dicho caso el empleado mintió en su solicitud de empleo al certificar no haber sido convicto de ningún delito. Mintió en tres (3) documentos sobre tal asunto. Los textos de tales documentos claramente consignaban la necesidad de que la información fuera veraz y correcta; advertían que de ésta ser falsa constituiría justa causa para el despido.

del patrono.[44] **Este caso no refleja una situación de falta única, sino, por el contrario, una conducta reiterada de violación a valores morales y de orden público de extraordinaria relevancia e importancia en Puerto Rico, y por un período de tiempo indefinido, que afectaron el ambiente de trabajo en la empresa.** Las circunstancias particulares de este caso no reflejan arbitrariedad o capricho alguno del patrono, al tomar la drástica decisión del despido del señor de León Cuadrado. Por el contrario, de la sentencia emitida por el Tribunal de Primera Instancia se desprende que el presidente de la empresa, señor Alberto González Simonet, trató de auscultar al máximo las posibles alternativas disponibles para no despedirlo, sin que se continuara afectando la empresa. De dicha sentencia surge, además, que ninguna otra alternativa, que no fuera el despido, lograba restaurar la tranquilidad en el ambiente de trabajo y el orden en la compañía, dadas las circunstancias ya mencionadas.

Concluimos, que el Tribunal de Circuito de Apelaciones incurrió en los errores señalados por la parte aquí peticionaria y, a base de las determinaciones de hechos del Tribunal de Primera Instancia, debió haber revocado la sentencia apelada ante sí.

VI

Por los fundamentos antes indicados, se revocará la sentencia emitida por el Tribunal de Circuito de Apelaciones y la dictada previamente por el Tribunal de Primera Instancia. En consecuencia, se declarará sin lugar la querella presentada ante este último por el señor Julio de León Cuadrado, por despido injustificado.

Se dictará sentencia de conformidad.


EFRAÍN E. RIVERA PÉREZ
Juez Asociado

---

[43] Íd., pág. 991.

[44] Delgado Zayas v. Hosp. Int. Med. Avanzada, supra; Srio. del Trabajo v. I.T.T., supra, pág. 543.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

HON. CÉSAR J. ALMODÓVAR
MARCHANY, Secretario del
Trabajo y Recursos Humanos
de Puerto Rico, en repre-
sentación y para beneficio
de JULIO DE LEÓN CUADRADO

    Apelado Recurrido

          v.                                CC-1998-408          Certiorari

G.P. INDUSTRIES, INC.

    Apelante-Recurrente

SENTENCIA


San Juan, Puerto Rico, a 17 de enero de 2001.


        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocando la sentencia emitida por el Tribunal de Circuito de Apelaciones y la dictada previamente por el Tribunal de Primera Instancia. En consecuencia, se declara sin lugar la querella presentada ante este último por el señor Julio de León Cuadrado, por despido injustificado.


        Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López emitió opinión de conformidad. El Juez Asociado señor Hernández Denton disiente con opinión escrita, a la cual se une la Jueza Asociada señora Naviera de Rodón. El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita.




                Isabel Llompart Zenó
            Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. César J. Almodóvar
Marchany, Secretario del
Trabajo y Recursos Humanos,
etc.

   Apelado-recurrido

          vs.                      CC-1998-408     CERTIORARI

G.P. Industries, Inc.

   Apelante-recurrente

Opinión de conformidad emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 17 de enero de 2001

La Ley Núm. 80 de 30 de mayo de 1976, según enmendada --en adelante Ley 80--, 29 L.P.R.A. sec. 185a *et seq.*, fue creada con el propósito de garantizarle a los empleados despedidos, sin justa causa, el derecho a recibir de su patrono una compensación correspondiente a un mes de sueldo más una indemnización adicional progresiva equivalente a una semana de sueldo por cada año de servicio. Véase Exposición de Motivos de la Ley 80. Por su carácter reparador, hemos reiterado que este estatuto deberá ser interpretado liberalmente a favor de los derechos del trabajador. Belk Arce v. Martínez, res. el 30 de junio de 1998, 98 TSPR 109.

La Ley 80 <u>no</u> define el término "despido sin justa causa", <u>sino que</u>

<u>enumera una serie de circunstancias y actos que justifican el despido</u>

<u>de un trabajador</u>. Véase Departamento del Trabajo y Recursos Humanos,

<u>Guías para la Interpretación y Aplicación de la Ley Núm. 80</u>, 1976, págs.

27-28. A estos efectos, el Artículo 2 de la Ley dispone:

"Se entenderá por justa causa para el despido de un empleado de un establecimiento:
(a) Que el obrero siga un patrón de conducta impropia o desordenada.
(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.
(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
(d) Cierre total, temporero o parcial de las operaciones del establecimiento.
(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido." 29 L.P.R.A. sec. 185b."[45]

En esencia, esta disposición estatutaria recoge las circunstancias "que a juicio del legislador justifican el despido de un empleado y, <u>aunque no necesariamente agotan</u> <u>las situaciones que pueden constituir justa causa para el despido</u>, definitivamente delinean el pensamiento y la preocupación del legislador de que la determinación de justa causa no incida [...] en el arbitrio de los tribunales". (Énfasis nuestro.) Departamento del Trabajo y Recursos Humanos, <i>ante</i>, pág. 29.

Ante la dificultad de establecer y enumerar en el estatuto todas las posibles situaciones que puedan dar base a un despido justificado, <u>los tribunales venimos en</u> <u>la obligación de evaluar situaciones, no contempladas de forma expresa por la Ley 80,</u> <u>para determinar si medió, o no, justa causa para el despido</u>. Tal facultad deberá ceñirse a lo establecido por esta legislación. <i>Id.</i>

A estos efectos, el Artículo 2 dispone que "[n]o se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". 29 L.P.R.A. sec. 185b. <u>De esta</u> <u>disposición podemos inferir y concluir que cualquier conducta, que afecte el buen y</u> <u>normal funcionamiento del establecimiento, puede considerarse como justa causa para</u> <u>el despido</u>.

En este sentido, hemos expresado que si una ofensa <u>pone en riesgo el orden y</u> <u>la seguridad de las operaciones del establecimiento</u>, la misma se considerará como justa

---

[45] **Los Incisos (a), (b) y (c) <u>se refieren a actuaciones de las cuales el</u> <u>empleado es responsable</u>. De otro lado, los Incisos (d), (e) y (f) son situaciones <u>no</u> imputables al empleado, sino al patrono y a la situación económica del negocio. Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes sobre el P. del S. 1112 de abril de 1976, págs. 2 y 3.**

causa para la acción de despido. <u>Srio. del Trabajo</u> v. <u>I.T.T.</u>, 108 D.P.R. 536, 543 (1979). A esos efectos, en <u>Belk Arce</u> v. <u>Martínez</u>, ante, señalamos que

"en los casos en que el patrono logre demostrar que el matrimonio entre dos de sus empleados <u>tendrá un efecto detrimental y adverso en el normal funcionamiento del departamento, área de trabajo o la empresa en general, podrá terminar la relación laboral con uno de sus empleados. Ello constituirá justa causa para el despido</u>." (Enfasis suplido.)

En el caso de autos, <u>no</u> existe controversia en cuanto al hecho de que el querellante Julio de León Cuadrado incurrió en conducta constitutiva de adulterio con Lyzette Torres Rodríguez, quien en ese entonces se encontraba casada con Rafael Nieves Goitía. Durante ese periodo de tiempo, <u>todos ellos laboraban para G.P. Industries, Inc.</u>

Somos del criterio que una persona adúltera lo es tanto en la intimidad como fuera de ella, pues el simple hecho de que los actos hayan ocurrido en privado <u>no</u> quita que éstos tengan un posible efecto adverso y detrimental fuera de la esfera de intimidad y sobre personas ajenas a los actos de adulterio. Es decir, independientemente de que en el presente caso los actos íntimos hayan o no ocurrido durante horas laborables, <u>no podemos pasar por alto que éstos tienen un efecto continuo que trasciende la esfera de intimidad de los actores</u>, pues existe una parte directamente afectada por dicho patrón de conducta --que en el caso ante nos era compañero de trabajo de ambos actores--, <u>creándose así un ambiente tenso, inestable y contrario al buen funcionamiento de la empresa</u>.[46]

Finalmente, entendemos que la relación adulterina entre el querellante y la señora Torres Rodríguez, cuando menos, <u>podía alterar el orden y la seguridad de las operaciones del establecimiento</u>. Ante los hechos del presente caso, y teniendo conocimiento de los mismos, la empresa se exponía al riesgo de que ocurrieran incidentes violentos --como resultado de dicha relación-- <u>por los cuales el patrono podría ser civilmente responsable</u>.

Debe mantenerse presente que, bajo el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, se exige a toda persona la diligencia que cabe esperar del ser humano promedio; <u>esto es, si el daño debió ser previsto por una persona común, existirá responsabilidad</u>. En este sentido, en <u>Negrón</u> v. <u>Orozco Rivera</u>, 113 D.P.R. 712 (1983), encontramos responsable a la Policía de Puerto Rico por no ejercer el cuidado razonable cuando debió existir, al menos, la sospecha de la ocurrencia de posibles actos violentos.

En consideración a este riesgo, creemos que el patrono en el presente caso <u>no</u> tenía la obligación de esperar a que ocurriera algún incidente violento, adverso a los mejores intereses de la empresa, <u>por lo que plenamente se justificaba el despido de</u>

---

[46] **"La libertad jurídica no es la libertad amorfa o abstracta, sino la reconciliada con el orden, la organizada y precisa y aun recortada en sus bordes <u>para armonizarlas con las múltiples instituciones sociales y</u>**

las personas responsables de haber alterado la paz, armonía y seguridad con que debe operar toda empresa.

En atención a los fundamentos antes expresados, es que le brindamos nuestra conformidad a la Opinión mayoritaria emitida en el presente caso.


                                        FRANCISCO REBOLLO LOPEZ
                                             Juez Asociado

---

jurídicas que hacen posible su existencia". (Énfasis nuestro.) (Escolio omitido.) Hermina González v. Srio. del Trabajo, 107 D.P.R. 667, 675 (1978).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Hon. César J. Almodóvar
Marchany, Secretario del
Trabajo y Recursos Humanos
de Puerto Rico, en
representación y para beneficio
de Julio de León Cuadrado          CC-98-408          Certiorari

     Apelado-Recurrido

        v.

G. P. Industries, Inc.

     Apelante-Recurrente


Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la que se une la Juez Asociada señora Naveira de Rodón


San Juan, Puerto Rico, a 17 enero de 2001.

No coincidimos con la interpretación que hace la mayoría del Tribunal de que, en ausencia de una reglamentación razonable, una relación adulterina es, de por sí, "un patrón de conducta impropia o desordenada" tan grave que amerita el despido inmediato de un empleado. Su contención es errada, tanto a la luz de la intención legislativa y la posterior interpretación administrativa de la ley, como de los actos propios del patrono en el caso de autos. La interpretación que hace la mayoría del Tribunal del concepto de justa causa es excesivamente amplia y no se justifica por los hechos del caso.

I

La Ley Núm. 80 del 30 de mayo de 1976, conocida como la Ley de Despido Injustificado o de la Mesada, fue aprobada para dar mayor protección a los trabajadores en casos de despido. Secretario v. I.T.T., 108 D.P.R. 536, 541 (1979). Enumera una serie de causas justificativas de despido, las que, sin entenderse exhaustivas, sirven de guía interpretativa a los tribunales al determinar si un despido fue o no razonable. Báez García v. Cooper Labs., Inc. 120 D.P.R. 145, 152 (1987).

La justa causa para el despido de un empleado ordinariamente surge de algún reglamento interno de la empresa o de la interpretación del texto mismo de la Ley Núm. 80. El Art. 2 de la Ley enumera las razones que constituyen justa causa para el despido. 29 L.P.R.A. § 185b. Entre éstas, las primeras tres (3) son atribuibles al empleado, al surgir de su alegada incompetencia o de su conducta impropia o dañosa a los intereses legítimos de la empresa:

> "Se entenderá por justa causa para el despido de un empleado de un establecimiento:
>
> (a)   Que el obrero siga un patrón de conducta impropia o desordenada.
>
> (b)   La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.
>
> (c)   Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado."

Las causas enumeradas en la ley son notablemente amplias y requieren, más que en otras leyes, el ejercicio de una discreción judicial fiel a la letra y al espíritu del estatuto para poder hacer justicia en un caso específico. Cada alegación de despido sin justa causa debe analizarse individualmente, caso a caso.

La Ley Núm. 80 es de naturaleza remedial, por lo que debe ser interpretada de manera que se cumplan los propósitos por los que fue aprobada. Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 763, 769 (1992). Dichos propósitos, que surgen claramente de la intención legislativa, son la protección de la seguridad del empleo, la limitación de las prerrogativas del patrono al disciplinar a sus empleados y la disuasión del despido como sanción disciplinaria. La Guía Revisada para la Interpretación, etc. de la Ley Núm. 80, ya citada, y la jurisprudencia de este Tribunal que la interpreta reiteran este propósito.

Este imperativo hermenéutico es particularmente relevante cuando se alega que un empleado fue despedido por una falta mayor o grave que no figura ni en la Ley ni en los reglamentos de la empresa. Se entiende por una falta mayor o grave, "aquella que es de tal seriedad o naturaleza que revela una actitud o un detalle del carácter del empleado que resulta tan lesivo a la paz y al buen orden de la empresa, que constituiría una imprudencia del patrono esperar su reiteración para proceder entonces a despedir [a]l empleado". Dpto. del Trabajo y Recursos Humanos, Guía Revisada para la Interpretación y Aplicación de la

Ley Núm. 80, pág. 31 (1976). Los casos de faltas mayores o graves se entienden como una excepción a la norma general que exige un patrón de conducta para configurar una causal de despido.

La interpretación de lo que es una falta mayor o grave, aunque no tiene que limitarse a las enumeradas en la Ley, debe ser sumamente restrictiva. "El análisis de lo que constituye una falta mayor o grave debe realizarse en la forma más restrictiva posible. Esto obedece al hecho de que con la excepción de situaciones en que la gravedad de la falta resulta evidente, la imposición de una medida disciplinaria tan rigurosa como el despido no se favorece ante una primera violaci[ó]n o falta aislada." A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, pág. 164 (1999).

Bajo el análisis mayoritario, cualquier conducta ilegal, no importa su incidencia real sobre las gestiones de la empresa, constituiría causa para un despido. Discrepamos de esa interpretación. La mera ilegalidad de una conducta no la transforma, ipso facto, en justa causa para el despido. Debemos recordar, a estos efectos, que una conducta criminal particular no es igualmente punible en toda circunstancia. Importantes derechos constitucionales, como la libertad de expresión y el derecho a la intimidad, pueden hacer inaplicable una disposición penal cuando la conducta proscrita se lleva a cabo en la intimidad. Stanley v. Georgia, 394 U.S. 557 (1969). Del mismo modo, la mera ilegalidad de una relación adulterina privada no justifica el despido de un empleado.

A estos efectos, es pertinente resaltar que nuestra jurisprudencia y la interpretación administrativa de la Ley Núm. 80 no han considerado cualquier conducta delictiva como una falta grave, sino sólo aquella relacionada con las labores de la empresa. En Torres Solano v. P.R.T.C., 127 D.P.R. 499 (1992), sostuvimos que era una ofensa grave que ameritaba el despido la agresión a un compañero de trabajo, durante horas laborables y en los predios de la agencia. En Autoridad de Edificios Públicos v. Unión Independiente de Empleados, 130 D.P.R. 983 (1992), hicimos lo mismo con relación al encubrimiento de convicciones criminales anteriores en una solicitud de empleo. Las Guías de Interpretación de la Ley Num. 80 añaden, a la pág. 31, "el asesinato de otro empleado en el lugar de trabajo" y el "asesina[to] o viola[ción] a una empleada en el lugar de trabajo". El elemento delictivo de esta conducta no basta para constituir causa de despido. Es necesaria una relación directa con el lugar de trabajo. De otro modo, se le estarían concediendo al patrono facultades punitivas que no le corresponden, pues son de la exclusiva competencia del Estado.

Concebiblemente, el interés legítimo de una empresa en prevenir los conflictos de interés, antagonismos interpersonales e incidentes de hostigamiento sexual que suscita la relación sentimental entre empleados podría justificar una política general de no-confraternización, siempre que ésta respete los límites que traza el derecho a la intimidad de los trabajadores. Sin embargo, una política de esta índole debe ser expresamente reglamentada por la empresa, de tal forma que sea conocida por todos los

empleados. "En el grado en que la condición lo permita, el empleado debe tener la oportunidad de conocer las normas de conducta que rigen en el lugar de trabajo y, ante una falta aislada, una amonestación inicial, y, de repetirse la misma, una suspensión de empleo y sueldo, resultan acciones disciplinarias más justas." A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, supra, pág. 165.

Ya antes habíamos suscrito el argumento de que una relación sentimental, adulterina o no, entre dos empleados no es causa justificada para despedir a uno o a ambos, de no mediar alguna política expresa, razonable y pública de la empresa a esos efectos. Más aún, la validez de una política tal está limitada a que la relación sentimental proscrita sea observable durante horas laborables y afecte directa y patentemente las operaciones del negocio. Es pertinente repetir aquí los pronunciamientos que a esos efectos hiciera la Juez Naveira de Rodón en su disenso en Cruz Sinigaglia v. Empresas Massó, 98 T.S.P.R. 80, res. el 25 de junio de 1998, al que entonces nos unimos.

> "El tribunal de instancia determinó que la verdadera razón del despido fue que la relación que sostenían los empleados dañaba la imagen de la empresa. **Massó debió presentar prueba sobre la existencia de alguna política de la empresa que prohíba este tipo de relación, su razonabilidad y el conocimiento de la misma por sus empleados**. Al no hacerlo, no refutó la presunción de despido injustificado". (Énfasis suplido).

No puede presumirse que la confraternización entre empleados, casados o no, es per se una falta mayor o grave, ni tampoco puede injertarse en la Ley Núm. 80, por interpretación judicial, como conducta "impropia o desordenada". El análisis que hace el Tribunal a esos efectos es tan amplio que desprovee a la enumeración de causas para el despido de toda utilidad directiva y todo contenido protector de los derechos de los trabajadores.

II

La correlación entre la incidencia y gravedad de una falta y la sanción disciplinaria impuesta por el patrono debe cumplir estrictamente no sólo el criterio de razonabilidad, si no también el de consistencia en su aplicación a los empleados.

> "Otro criterio que debe estar presente es que la actuación del patrono con relación a las exigencias de conducta de sus empleados debe ser consistente y uniforme. La ausencia de este requisito, como sería el castigar por una misma falta unas veces sí y otras no, puede acercar peligrosamente el despido a la clasificación de caprichoso." Op. Del Srio. del Trab. Y Rec. Hum. Núm. 91-3.

En el caso de autos, de los hechos narrados en la Opinión del Tribunal es evidente que G. P. Industries no fue consistente en reprimir la confraternización entre empleados o incluso las relaciones adúlteras en la misma empresa. La empresa había permitido, en al menos una ocasión anterior, una relación extramatrimonial entre un alto ejecutivo de la empresa y una empleada. No podemos obviar el hecho de que Nieves Goitía, el cónyuge alegadamente afectado por la relación entre León Cuadrado y Torres Rodríguez, conoció a

esta última mientras laboraba en la G. P. Industries, estando él casado entonces con una tercera persona.

Ante este precedente, puede concluirse que León Cuadrado no tenía razón para presumir que se le disciplinaría por actos que, cuando habían sido cometidos por otro empleado gerencial, no habían inmutado a la administración. Al no existir reglas en la empresa contra la confraternización y el adulterio entre empleados y al existir un historial de tolerancia a dicha conducta, estimamos que a León Cuadrado se le trató de forma desigual para favorecer a un empleado administrativo de mayor rango. Independientemente de las razones para dicha discrepancia, ésta viola principios básicos de justicia y equidad en el empleo.

> "Just cause, as articulated in the arbitration law of discipline, can include only conduct that the employee knows is subject to discipline. This does not mean that all offenses must be stated, either orally or in writing. **An employee need not be told in advance that stealing the employer's property, sleeping on the job, attacking fellow employees, or engaging in a wildcat strike is prohibited. But he is not bound by plant rules that have not been brought to his attention, nor can he be punished for conduct he did not reasonably understand was prohibited.** Management's right to prescribe rules is matched by its obligation to make those rules known to the employees.
>
> **Making the rules known to the employees is not enough, however, if the employees reasonably believe the rules will not be enforced.** Where a no-smoking rule has regularly been ignored and no effort has been made to enforce it, an employee cannot be disciplined for smoking, even in front of a prominently posted "No Smoking" sign. Employees who have openly been taking home scrap or supplies for personal use with the knowledge of management cannot be disciplined for stealing without warning. Management must first give clear warning that henceforth the rule will be enforced and violators punished." W.J. Holloway, M.J. Leech, <u>Employment Termination</u>, págs. 116-17 (1985) (Énfasis suplido).

La falta de consistencia en la sanción de relaciones adulterinas entre empleados levanta serias sospechas en cuanto a la validez de los procedimientos seguidos por la empresa al despedir a León Cuadrado y a Torres Rodríguez. Además, esto evidencia la imposición de medidas disciplinarias sin que pueda probarse o presumirse conocimiento de la conducta proscrita por parte del empleado. Sugiere un trato desigual a empleados de distinta jerarquía en asuntos en los que no deben tener lugar dichas consideraciones. Independientemente de la naturaleza de la falta cometida, la inconsistencia disciplinaria de G. P. Industries hizo arbitrario y caprichoso el despido de León Cuadrado y Nieves Rodríguez.

Entendemos además que el despido de estos empleados tiene un impacto desigual relacionado al género de los ofensores. Su efecto es premiar el doble estándar demostrado por Nieves Goitía quien, estando casado con otra persona y teniendo tres (3) hijos en dicha relación, entabló una relación sentimental con Torres Rodríguez. No toleró, sin embargo, la infidelidad de Torres Rodríguez cuando ésta advino su cónyuge. Entró además en un conflicto abierto con León Cuadrado que alegadamente provocó tensiones en la empresa. Por más arraigado que esté el proverbial chauvinismo de Nieves Goitía en la cultura puertorriqueña, no debe condonarse mediante el despido de dos empleados.

III

Por otro lado, estimamos pertinente responder a la contención de que, al despedir a León Cuadrado y Torres Rodríguez, G. P. Industries actuó de acuerdo a una política de prevención de hostigamiento sexual. El hostigamiento sexual es un problema de incomparable gravedad en el ámbito laboral. Atenta contra la dignidad del ser humano y muy particularmente contra la de la mujer, quien es la persona más afectada por esta conducta, debido a los patrones culturales existentes. La implantación efectiva de la política pública contra el hostigamiento sexual y de las leyes y reglamentos que la encarnan es de vital importancia en nuestra sociedad.

Por esa misma razón, el uso artero y falacioso por parte de un patrono de las leyes para la prevención del hostigamiento sexual, como subterfugio para el despido de dos empleados, desvirtúa el propósito de las mismas. Más es así cuando dicho patrono no demostró tener una política previa contra el hostigamiento sexual, como exige la <u>Ley para Prohibir el Hostigamiento Sexual en el Empleo</u>, Ley Núm. 17 del 22 de abril de 1988, y no aplicó sus disposiciones de forma equitativa, razonable o consistente.

A.

El elemento definitorio del hostigamiento sexual es la no deseabilidad de la conducta proscrita. Así lo indica el Art. 3 de la Ley.

> "El hostigamiento sexual en el empleo consiste en cualquier tipo de acercamiento sexual no deseado, requerimientos de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual".

Toda la evidencia indica que la relación sentimental entre León Cuadrado y Torres Rodríguez era consensual y no había indicio de que dejaría de serlo. Sin embargo, somos concientes que una relación que comience de manera voluntaria y consentida puede degenerar en una situación de hostigamiento. De existir una preocupación genuina de la empresa en que la relación entre León Cuadrado y Torres Rodríguez podría degenerar en un incidente de hostigamiento sexual, habría sido más razonable tomar medidas menos drásticas, tal como la advertencia a ambos empleados de que debían descontinuar la relación o el traslado de León Cuadrado a otra unidad o dependencia de la empresa. La empresa no consideró la primera alternativa y descartó expresamente la segunda, aunque por consideraciones enteramente ajenas al hostigamiento sexual.

Su acción no fue una medida provisional preventiva sino una acción enteramente punitiva, tomada en contravención a las <u>Guías para la Implantación de Política Pública y Procedimiento Interno de Querellas Sobre Hostigamiento Sexual en el Empleo</u>, emitidas por la Comisión para los Asuntos de la Mujer. En primer lugar, la única querella sometida ante la compañía sobre la relación entre León Cuadrado y Torres Rodríguez fue sometida por Nieves Goitía y no versaba sobre incidente alguno de hostigamiento sexual. En segundo lugar, de haberse sometido una querella a esos efectos, la empresa estaría obligada a tomar medidas preventivas provisionales mientras se dilucidaba la querella. No obstante, dichas medidas "no deben entenderse como una sanción contra el/la querellado(a)". <u>Guías para la Implantación de Política Pública, etc</u>., supra, pág. 8.

B.

Para prevenir incidentes de hostigamiento sexual, un patrono debe implantar una política de prevención del hostigamiento sexual, conforme a lo dispuesto en el Art. 10 de la Ley.

> Todo patrono tiene el deber de mantener el centro de trabajo libre de hostigamiento sexual e intimidación y deberá exponer claramente su política contra el hostigamiento sexual ante sus supervisores y empleados y garantizará que puedan trabajar con seguridad y dignidad. Cumpliendo con la obligación que se le impone al patrono de prevenir, desalentar y evitar el hostigamiento sexual en el empleo, éste deberá tomar las medidas que sean necesarias o convenientes con ese propósito incluyendo, pero sin limitarse, a las siguientes:

> (a)  Expresar claramente a sus supervisores y empleados que el patrono tiene una política enérgica contra el hostigamiento sexual en el empleo.

> (b)  Poner en práctica los métodos necesarios para crear conciencia y dar a conocer la prohibición del hostigamiento sexual en el empleo.

> (c)  Dar suficiente publicidad en el lugar de trabajo, para los aspirantes a empleo, de los derechos y protección que se les confieren y otorgan bajo las secs. 155 a 155l de este título, al amparo de las secs. 1821 a 1341 de este título, las secs. 146 a 151 de este título y de la Constitución del Estado Libre Asociado de Puerto Rico.

> (d)  Establecer un procedimiento interno adecuado y efectivo para atender querellas de hostigamiento sexual.

Con esta perspectiva, tampoco se justifica el despido de León Cuadrado como parte de una política de prevención de hostigamiento sexual. Dicha política, inexcusablemente, no existía en G. P. Industries. Cabe recordar que, cuando se suscitó la relación entre Nieves Goitía y Torres Rodríguez, existía también la posibilidad de que desembocara en hostigamiento sexual, pues la Ley Núm. 17 rechaza explícitamente la necesidad de "establecer que el agente o supervisor que cometió el hostigamiento sexual supervisaba directamente al reclamante". Por tanto, no es determinante, como alude G. P. Industries, el que Nieves Goitía no fuera entonces supervisor directo de Torres Rodríguez.

Si bien aquel incidente se produjo antes de la aprobación de nuestra Ley de hostigamiento sexual, debió haber prevenido a la empresa de la posible recurrencia de situaciones similares y haberla motivado a aprobar una política de prevención del hostigamiento. No hay prueba de que esto se hiciera. Sólo al requerir causa para despedir a dos empleados se invoca una ley que G. P. Industries no se ha molestado en implantar. Dudamos pues de la seriedad de la empresa en cuanto a implantar una política contra el hostigamiento sexual en este caso.

Por último, tenemos que resaltar la inconsistencia implícita en invocar la prevención de hostigamiento sexual en la empresa para justificar el despido de Torres Rodríguez, la posible víctima de dicha práctica.

IV

A modo de conclusión, nos preocupa mucho la decisión de este Tribunal de interpretar una ley protectora de los derechos de los trabajadores de manera que amplíe la discreción del patrono a la hora del despido. Al así decidir, este Tribunal sobre extiende el concepto de justa causa e interpreta las disposiciones de la Ley Núm. 80 de forma contraria a la

intención legislativa.  Además, pone un poder desmerecido en manos de los patronos para disciplinar sumariamente a sus empleados por razones ajenas a su desempeño en el lugar de trabajo e inyecta en nuestro ordenamiento nociones y fundamentos moralizantes que no tienen lugar en legislación laboral y son incompatibles con un estado de derecho justo.  Por esto disentimos.


                                   FEDERICO HERNÁNDEZ DENTON
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


César J. Almodóvar Marchany
Sec. del Trabajo, etc.

     Apelado-Recurrido

         v.                  CC-1998-408        Certiorari

G.P. Industries, Inc.

     Apelante-Recurrente


OPINION DISIDENTE emitida por el Juez Asociado señor Fuster Berlingeri.

San Juan, Puerto Rico, a 17 de enero de 2001.


Una vez más me veo compelido a disentir de un dictamen de la mayoría del Tribunal en un caso de relaciones obrero-patronales. Como en otras ocasiones, difiero de la interpretación de la ley que hace la mayoría en detrimento del derecho de un trabajador a ganarse la vida y en menoscabo del régimen jurídico que prevalece en el país.  Difiero, sobre todo, de la función moralizadora que toma para sí la mayoría en este caso.

Para que queden bien claras las razones de mi disenso, debo comenzar señalando que coincido en general con las expresiones de la mayoría en torno al carácter impúdico que tiene una relación adulterina.  De ordinario, infringe valores morales

de nuestra sociedad y constituye una injusticia contra el cónyuge afectado.

Sin embargo, la cuestión jurídica medular en el caso de autos **<u>NO</u>** es si el adulterio constituye conducta inmoral o delictiva.  La cuestión más bien es si el querellante **<u>en su trabajo</u>** incurrió en algún comportamiento errado que afectase de modo adverso el buen funcionamiento del negocio de su patrono, a tal grado que justificase su despido sumario.

En este caso, no hay prueba alguna de que el querellante fuese un empleado poco eficiente o que no cumpliese con las normas de trabajo de la empresa.  **<u>Todo lo contrario</u>**. El patrono del querellante admitió que éste era un **<u>empleado excelente</u>**.  No existían quejas contra él antes.

**<u>Tampoco existe prueba alguna de que el querellante llevara a cabo en el empleo la relación adulterina en cuestión</u>**.  Todo lo contrario.  El patrono no tuvo evidencia ni siquiera de la existencia de tal relación hasta que se contrató un detective privado que produjo una supuesta prueba[47] sobre la conducta del querellante con la señora en cuestión en **<u>un lugar fuera del trabajo</u>**, mientras dicha señora **<u>se encontraba separada de su marido</u>**.

En otras palabras, la relación adulterina alegada, de haberse probado debidamente, era esencialmente un **<u>asunto privado</u>** del querellante, que no se realizaba en el empleo, y

---

[47] Según surge de la evidencia documental que obra en autos, la supuesta prueba del adulterio consiste de unas fotos en las cuales el querellante besa a la señora en un restaurant.

que no afectaba ni su rendimiento laboral ni el de la señora aludida. Dicha conducta privada del querellante no estaba prohibida por la empresa en sus normas de empleo. De hecho, según determinó el foro de instancia, dos de los tres empleados involucrados ahora en el caso de autos ya antes habían sostenido relaciones adulterinas mientras formaban parte de la empresa en cuestión y el patrono no los expulsó de su trabajo entonces. En efecto, la empleada con quien el querellante alegadamente sostuvo la relación amorosa del caso de autos había tenido años antes un romance con otro gerente de la misma empresa, que dio lugar a que éste se divorciara de su primera esposa y se casara con la empleada en cuestión. En aquella ocasión, idéntica en los hechos a la de autos, el patrono no tomó acción contra la empleada ni contra el gerente referido, quien ahora era el marido de la empleada y se desempeñaba como Jefe de Operaciones de la empresa. Aquel adulterio no dio lugar a la acción de despido efectuada por el patrono ahora por el nuevo adulterio del caso de autos. El patrono, pues, obviamente no tenía establecida prohibición alguna sobre el particular previo a los incidentes que aquí nos conciernen. Por ello, no tenía el patrono tal fundamento para justificar el despido en cuestión. _Federated Rural Electric Ins. Co. v. Kessler_, 388 N.W. 2d 553 (Wis. 1986).

El patrono tampoco tenía causa justificada para el despido del querellante al amparo de nuestra legislación laboral. No hay nada en la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a a 185i que establezca que lo que ocurre en la vida privada de un obrero, fuera de su empleo, y que no afecte su rendimiento laboral, puede ser justa causa para su despido. Dicha legislación no autoriza de ningún modo a los patronos a convertirse en guardianes de la moral extra laboral de sus empleados. Por el contrario, la incursión por un patrono en la vida privada de un trabajador a los fines de sancionarlo por conducta relativa a esa vida privada cuando menos plantea serios problemas al amparo de nuestra garantía constitucional sobre el derecho a la intimidad. _Arroyo v. Rattan Specialties, Inc._, 117 D.P.R. 35 (1986). En otras jurisdicciones incluso se ha resuelto que una actuación patronal como la del caso de autos presenta problemas de discrimen injustificado contra el trabajador. _Slohada v. United Parcel Service, Inc._, 504 A 2d 53 (N.J. 1986).

En su dictamen, la mayoría hace hincapié en que el presidente de la empresa testificó que despidió al querellante porque supuestamente en dicha empresa había "un estado de intranquilidad", provocado porque "en algún momento" el Jefe de Operaciones y el querellante "se encontrarían." Nótese que la supuesta aprensión referida del presidente de la empresa no sólo es de naturaleza **especulativa** sino que, además, es inconsistente con la experiencia adulterina habida antes entre la empleada y el Jefe de Operaciones. Mas aun, según los hechos del caso, el Jefe de Operaciones ya se divorció de la empleada aludida. Además, el querellante es gerente de área en la región de Humacao-Fajardo, y no trabaja de ordinario junto con el aludido Jefe de Operaciones, cuyas oficinas radican en Bayamón. La supuesta

aprensión del presidente, pues, es una racionalización para tratar de justificar el despido. El expediente está huérfano de prueba alguna que demuestre la razonabilidad de la preocupación del presidente. Igualmente, la afirmación de la mayoría de que los dos gerentes referidos "necesariamente tenían que interrelacionarse en el sitio del trabajo" es una conclusión de ésta, que no surge de la sentencia del tribunal de instancia ni de los documentos que obran en autos.

En otras palabras, la supuesta justificación para el despido, la "intranquilidad" del presidente de la empresa, que la mayoría toma como fundamento para determinar que el supuesto idilio privado del querellante había puesto en riesgo el orden y el normal funcionamiento de la empresa, no pasa de ser una mera excusa. No hay prueba sobre el hecho referido. Se trata de una alegación conclusoria que la mayoría por puro fiat adopta como buena, para poder justificar de algún modo su extralimitado dictamen.

Es por todo lo anterior, que no procede que este Tribunal interprete la Ley Núm. 80, supra, referida de una manera tan infundada y tan ominosa como lo hace la mayoría aquí, abriendo así las puertas para despidos laborales arbitrarios y para las cacerías de brujas. Por deleznable que sea la conducta privada del obrero, **no es en ámbito laboral en el cual tal conducta es sancionable**. No debe este Tribunal pontificar sobre la moral en una situación como la de autos, ni transformar artificialmente su moralina en una supuesta razón para el despido injustificado de un trabajador.

Un patrono, claro está, tiene derecho a no querer en su empresa a una persona que considera inmoral. Para ello sólo tiene que despedirlo **y pagarle la mesada que fija la Ley Núm. 80, supra**. Lo que no puede hacer bajo nuestro ordenamiento jurídico es despedirlo sin el beneficio de esa mesada.

Como la mayoría opta por un curso de acción contrario, que considero paternalista, peligroso, y antiobrero, yo disiento.


                            JAIME B. FUSTER BERLIGERI
                            JUEZ ASOCIADO